**SOUTH EAST CHICAGO COMMIS-
SION et al., Plaintiffs-Appellants,**

v.

**DEPARTMENT OF HOUSING AND UR-
BAN DEVELOPMENT et al.,
Defendants-Appellees.**

No. 72–1795.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1973.

Decided Oct. 19, 1973.

See also, D.C., 343 F.Supp. 62.

Charles Barnhill, Jr., Reuben L. Hedlund, Chicago, Ill., for plaintiffs-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Jerome H. Torshen, Richard L. Curry, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, and KILEY and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

Plaintiffs, mostly residents of the Kenwood and Hyde Park communities of Chicago, brought this action in the district court to set aside a commitment made by the federal defendants [1] and approved by the City of Chicago to provide Lake Village Associates with mortgage insurance and interest subsidization in

1. These include the Department of Housing and Urban Development (HUD), George Romney, the Secretary of HUD, the Federal Housing Administration (FHA), and Ernest C. Stevens, the Director of the FHA Insuring Office in Chicago.

connection with a low-income housing project which Lake Village planned to erect at the border of Kenwood. In three of four counts,[2] the plaintiffs claimed (1) that the commitment was in violation of the Constitution, various statutory provisions, and regulations issued by HUD, (2) that the commitment was finalized in violation of plaintiffs' rights to due process and fair procedure, and (3) that the commitment was sought by Lake Village and accepted by the City in violation of a contract between them which plaintiffs, as third party beneficiaries, had a right to enforce. Both sides moved for summary judgment on the three counts. The defendants prevailed. The district judge found, upon a narrow review of the agency action, that the commitment of FHA and HUD was within the law as a matter of both substance and procedure, and that Lake Village and the City were in compliance with the contract sued upon. This appeal followed.

## I

The City of Chicago invited bids in 1966 for the acquisition and development of certain parcels of land to which it had acquired title a few years earlier pursuant to an urban renewal plan for the Hyde Park and Kenwood areas of Chicago. One of those parcels, designated HR-1 by the City, was bounded on the north by 47th Street, the southern terminus of a census tract adjacent to HR-1 which had a white population of approximately one percent. The census tract in which HR-1 was located had a forty-two percent black population. In 1966, HR-1 and adjoining parcels were the subject of two detailed offers for acquisition and development made by Lake Village and the United Dwelling Foundation of Metropolitan Chicago.

The bids were reviewed by the Department of Urban Renewal of the City of Chicago, which issued a recommendation that both bidders develop the parcels jointly. Lake Village and United Dwelling Foundation, on June 20, 1967, signed an agreement that Lake Village would withdraw its bid and that, upon a conveyance to United Dwelling Foundation of the property, United Dwelling Foundation would reconvey to Lake Village for development a portion of the land which included the northern three acres of HR-1, a parcel subsequently designated HR-1B. The entire tract of land was then conveyed to United Dwelling Foundation pursuant to this agreement by a resolution of the Department of Urban Renewal. At approximately the same time the United Dwelling Foundation entered into a redevelopment agreement with the City of Chicago, to the terms of which Lake Village became bound by a partial assignment from United Dwelling Foundation.

Some two years later FHA committed itself to fund a project which Lake Village intended to erect on parcel HR-1B. Upon learning of this, certain of the plaintiffs voiced objections based on their fear that federal subsidization—which necessarily limited the prospective tenancy of the Lake Village project to persons of low income—would bring a number of poor blacks into the Kenwood area, upsetting the racial balance of that predominantly white area. Defendant Ernest C. Stevens, the local Insuring Office Director for FHA, arranged a conference between Lake Village, the objectors and himself. On July 15, 1971, all parties were allowed to present documentary matter and to argue in support of their respective positions. Stevens refused to transcribe the meeting, to allow cross-examination of witnesses, or to grant the objectors access to certain information known to FHA. At the completion of the conference, and after a meeting of FHA and HUD personnel, Stevens issued a written administrative determination not to rescind the commitment of FHA to Lake Village.

Plaintiffs thereupon filed suit on August 10, 1971, and recorded a *lis pendens*

---

2. Counts I, II and IV of the complaint are the subject of this appeal. Count III survived a motion to dismiss in the district court and evidently awaits trial.

notice. In the first count of their complaint, they sought to enjoin the federal defendants from issuing to Lake Village Associates, and the City of Chicago from approving, mortgage insurance and interest reduction subsidies under 12 U.S.C. § 1715z–1 in connection with the Lake Village project. In support of their right to contest the use of federal subsidy programs, the plaintiffs cited the Fifth and Fourteenth Amendments, the National Housing Act, the 1964 and 1968 Civil Rights Acts, and regulations of HUD and FHA. In a second count, the plaintiffs set out a challenge to the procedural integrity of the decision by HUD and FHA to provide the Lake Village project with federal assistance. They sought relief by a trial *de novo* on the merits of their substantive claims and an injunction such as was sought in the first count, or, alternatively, by an order directing the federal defendants to afford them an adequate rehearing. A fourth and final count, founded on the doctrine of pendent jurisdiction, made reference to the redevelopment contract between the City and Lake Village, stated that the plaintiffs were the "intended beneficiaries" thereof, alleged that the contract had been violated by Lake Village and the City by their arrangement of extensive federal funding for the project, and asked for specific performance of the contract by Lake Village and the City.

On motion of defendants, the district judge entered a summary judgment against plaintiffs on all three counts. He found that the federal defendants had employed a proper legal standard and that their decision was based on a "consideration of the relevant factors . . . [with] no clear error of judgment." As to the procedural claim of plaintiffs, he denied it on the ground that "plaintiffs' rights are adequately protected by their opportunity to obtain judicial review," citing Shannon v. Dept. of Housing and Urban Development, 436 F.2d 809 (3d Cir. 1970). He found, lastly, that the contract claim of plaintiffs was contradicted by the very terms of the agreement sued upon.

## II

According to the plaintiffs, the law which dictates national housing policy for the purposes of this case is contained in 24 C.F.R. § 200.700 et seq., 42 U.S.C. § 3608(d)(5), Shannon v. Dept. of Housing and Urban Development, 436 F.2d 809, 820–821 (3d Cir. 1970), Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971), and Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969). The defendants would concur in this list did it not contain a citation to 24 C.F.R. § 200.700 et seq., known to the parties as the Project Selection Criteria. Director Stevens, in particular, paid no heed to the Criteria in weighing the objections of plaintiffs to the FHA commitment. Our first task is to resolve this difference. Loosely speaking, the question is one of retroactivity, for the Criteria, though first published on June 24, 1971, did not become effective until February 7, 1972, long after HUD and FHA had solidified their commitment to Lake Village.

There are few principles of our law more ancient, and none more respected, than the canon which holds that laws are enacted for the future. A legislative pronouncement may not operate on acts which predate its passage. Neither may it serve to divest rights which have come into concrete existence before its date of effect. In our early days, the principle was seen by many judges to be a transcendental limitation upon the power of the legislature. *See, e. g.,* Terrett v. Taylor, 13 U.S. (9 Cranch) 23, 27, 3 L.Ed. 650 (1815) (Story, J.); Calder v. Bull, 3 U.S. (3 Dall.) 305, 306–307, 1 L.Ed. 648 (1798) (Chase, J.). Modern times have refined this perception, and the principle today stands embodied in a number of constitutional principles: Laws acting ex post facto are void; so, too, are enactments which work to the impairment of contract or the deprivation of property without due

process. Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 17 L.Ed. 1434 (1934); McCracken v. Hayward, 43 U.S. (2 How.) 587, 11 L.Ed. 397 (1844). *See generally,* Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn.L.Rev. 775, 789–97 (1936). In construing legislation, then, courts have rigorously adhered to a rule of construction that a law will not be given retroactive effect without a clear mandate to that end from its enacting body, for judges have always been reluctant to decide constitutional questions unless they must. *See* Union Pacific Ry. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199–200, 34 S. Ct. 101, 58 L.Ed. 179 (1913). As put in Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964):

> [T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past . . . [and] a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' 376 U.S. at 160, 84 S.Ct. at 621.

This is a rule of long standing. *See, e. g.,* Claridge Apartments Co. v. Commissioner of Internal Revenue, 323 .U.S. 141, 164, 65 S.Ct. 172, 89 L.Ed. 139 (1944); United States v. Magnolia Co., 276 U.S. 160, 162–63, 48 S.Ct. 236, 72 L.Ed. 509 (1928); United States v. Heth, 7 U.S. (3 Cranch) 239, 248, 2 L. Ed. 479 (1806).

■ In sum, courts are charged with a threefold task when a statute is to be found retroactive. They must determine, first, whether a statute "interferes with antecedent rights." [3] If so, retrospective operation becomes a question purely of legislative intent; such must be the "unequivocal and inflexible import of the terms, and the manifest intention of the legislature." Only then may a court rightly reach the constitutional question presented. *See* Union Pacific Ry. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199–200, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913).

Perhaps the earliest example of this analysis in the Supreme Court is contained in the case of United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 64, 2 L.Ed. 49 (1801). There a French ship had been seized as a prize of war by a naval vessel of the United States and condemned thereafter as forfeited to the use of the United States by a final judgment of a circuit court. Before the case was heard in the Supreme Court, the governments of France and the United States made a treaty which provided for the return of French vessels not "definitively" condemned. Chief Justice Marshall, writing for the Court, found that the vessel at suit fell within the terms of the treaty:

> The last decree of an inferior court is final, in relation to the power of that court, but not in relation to the property itself, unless it be acquiesced under. The terms used in the treaty seem to apply to the actual condition of the property, and to direct a restoration of that which is still in controversy between the parties. On any other construction, the word *definitive* would be rendered useless and inoperative. Vessels are seldom, if ever, condemned, but by a final sentence: an interlocutory order for a sale is not a condemnation. 5 U.S. at 68.

The Chief Justice undertook this construction in the face of his recognition that by the treaty, so construed, "the nation [had] given up the vested rights of its citizens." 5 U.S. at 69. He conclud-

---

3. Not all laws which substantially affect preexistent contracts or divest property rights are violative of the Constitution. Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 280 n. 35, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 54 S. Ct. 231, 78 L.Ed. 413 (1934). Thus, an initial inquiry into the impairment of antecedent rights falls far short of a constitutional ruling.

ed that the divestiture was within the power of the government:

It is true, that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, where individual rights, acquired by war, are sacrificed for national purposes, the contract making the sacrifice ought always to receive a construction conforming to its manifest import; and if the nation has given up the vested rights of its citizens, it is not for the court, but for the government, to consider whether it be a case proper for compensation. 5 U.S. at 69.[4]

The judgment of condemnation was accordingly set aside.

In disagreement, the plaintiffs read *Schooner Peggy* to state a general rule, that a court must apply the law in effect at the time it renders its decision, evidently relying on the same interpretation of that case by the Supreme Court in Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 281–282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). We need not quibble, however, over the question of whether the general rule or its exceptions—the existence of which the Court in *Thorpe* acknowledged—are such in fact or the reverse, for *Thorpe*

and each of its foundation cases exemplify the traditional mode of analysis. The question in *Thorpe* was whether a tenant of a federally assisted housing project was entitled to eviction proceedings consistent with a HUD circular which first came into effect while a challenge to her eviction was pending in the Supreme Court. The Court went no farther than the first inquiry, for it found:

[R]equiring the Authority to apply the circular before evicting petitioner not only does not infringe upon any of its rights, but also does not even constitute an imposition. The Authority admitted during oral argument that it has already begun complying with the circular. It refuses to apply it to petitioner simply because it decided to evict her before the circular was issued. Since petitioner has not yet vacated, we fail to see the significance of this distinction. 393 U.S. at 283, 89 S.Ct. at 527.

To the same effect are Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941), and Carpenter v. Wabash Ry. Co., 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940), each of which involved a situation where retroactive application of a particular law involved, at most, a minimal disturbance of antecedent rights.[5] *See also*

---

4. Strictly speaking, this pronouncement may not have been one upon the constitutionality of the treaty, the Chief Justice having stated in the preceding sentence: "If the law be constitutional, and of that no doubt, in the present case, has been expressed. I know of no court which can contest its obligation." 5 U.S. at 68–69. We express some reservation on the point because an alternative interpretation is feasible. More than nine years after *Schooner Peggy* came down, the Chief Justice wrote for the Court in the somewhat similar case of Fletcher v. Peck, 10 U.S. (6 Cranch) 48, 3 L.Ed. 162 (1810). Without going into detail, we quote the ultimate holding of *Fletcher*:

It is, then, the unanimous opinion of the court, that, in this case, the estate having passed into the hands of a purchaser for a valuable consideration, without notice, the state of Georgia was restrained, either by

general principles which are common to our free institutions, or by the particular provisions of the constitution of the United States, from passing a law whereby the estate of the plaintiff in the premises so purchased could be constitutionally and legally impaired and rendered null and void. 10 U.S. at 78.

That is, both the natural law and the Constitution were seen to place restraints on the government in enacting retroactive laws. The language quoted from *Schooner Peggy* may thus have been directed to the obstacle of the natural law. Today, of course, the decision would go off solely on the Constitution, the bounds of which have been expanded since *Fletcher* to take in many principles long thought to be natural law.

5. *Vandenbark*, moreover, was concerned with a judicial decision. It is well established

Ziffrin, Inc. v. United States, 318 U.S. 73, 78, 63 S.Ct. 465, 87 L.Ed. 621 (1943); Jones v. Lynn, 477 F.2d 885 (1st Cir. 1973).[6]

A somewhat different case is United States v. Chambers, 291 U.S. 217, 54 S. Ct. 434, 78 L.Ed. 763 (1934), where the government had obtained an indictment under a law which subsequently became invalid upon repeal of the Eighteenth Amendment. That the government was not allowed to continue with its prosecution is consistent with traditional principles. A curative law—the Twenty-First Amendment—was involved, one which legalized conduct which had theretofore been illegal. See Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn. L.Rev. 775, 785 n. 36 (1936). *Chambers* is unique, too, in that a criminal conviction was at stake; had the Court reached the opposite result, Chambers would have been punished for conduct which society as a whole no longer considered reprehensible, all for the sake of a vested indictment.

The instant case is much like Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), yet another case conforming to the analysis of *Schooner Peggy*. There the Court was presented with a regula-

tion which required the Secretary of Transportation to make formal findings when he approved the use of parkland for highway construction pursuant to 23 U.S.C. § 138 and 49 U.S.C. § 1653(f). Partially at issue was the applicability of this regulation to an approval by the Secretary which had taken place before the regulation was in effect. The petitioners conceded that the regulation "was not intended to have retrospective effect," 401 U.S. at 418, 91 S.Ct. at 824, but argued that *Thorpe* required an opposite conclusion. Finding that an interference with antecedent rights would occur, the Court limited the regulation to prospective effect:

> While we do not question that DOT Order 5610.1 constitutes the law in effect at the time of our decision, we do not believe that *Thorpe* compels us to remand for the Secretary to make formal findings. Here, unlike the situation in *Thorpe*, there has been a change in circumstances—additional right-of-way has been cleared and the 26-acre right-of-way inside Overton Park has been purchased by the State. Moreover, there is an administrative record that allows the full, prompt review of the Secretary's action that is sought without additional delay which would result from having a remand to

---

that judicial decisions are, with few exceptions, inherently retroactive. See James v. United States, 366 U.S. 213, 225, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961) (Black, J., dissenting); Mishkin, Foreword: The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56, 65–66 (1965).

6. The question in *Jones* was whether a substantially incomplete urban renewal project was subject in any way to the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq., which had been enacted after the approval of a federal financial commitment. The Court of Appeals held:

> [S]ound public policy requires rejection of appellees' proposed rule that NEPA is per se inapplicable to projects already underway as of the passage of the act.
> * * *
> While it may be fruitless to apply procedural protections afforded by NEPA to a

project which has been so far terminated to preclude *any* change in plans, "the only correct interpretation would seem to be that if the requirements of the Act can feasibly be applied—even if the project in question was begun prior to the enactment of NEPA—then they should in fact be applied." Note, Retroactive Application of the National Environmental Policy Act of 1969, 69 Mich.L.Rev. 732, 743 (1971). Though such applications of NEPA have been called retroactive, *see, e. g.,* Natural Resources Defense Council v. Grant, 341 F.Supp. 356 (E.D.N.C.1972), they are in fact prospective since they seek to alter, within proper limits, the aspects of a proposal which have not yet been completed, and not to undo anything which has already proceeded to final construction.
> * * *
> The first, and basic question, is what are proper limits; what, in other words, can be regarded as prospective, and what not, but must fairly be regarded as vested.

the Secretary. 401 U.S. at 419, 91 S. Ct. at 825.[7]

Having *Overton Park* and its predecessors before us, and mindful of the principles they represent, we turn our attention to the question before us.

�as There can be little doubt that antecedent rights would be disturbed by a retroactive application of the Criteria. On August 11, 1971, HUD became contractually obliged to provide Lake Village with mortgage insurance and interest reduction payments. Lake Village has since erected a building on the faith of that obligation. Plaintiffs do not suggest that Lake Village would not suffer grave harm were HUD to rescind its obligations; they argue, instead, that Lake Village took its chances by electing to proceed with construction in the face of their appeal of the HUD commitment .

---

7. Plaintiffs misread *Overton Park* in much the same way that they misconstrue Harrisburg Coalition Against Ruining the Environment v. Volpe, 330 F.Supp. 918 (M.D. Pa.1971). By the interpretation of plaintiffs, "the Supreme Court in *Overton Park* halted further construction of an interstate highway until there was compliance with the procedural requirements of a newly promulgated . . . regulation." App. Br. at 23. Nothing could be more plainly in error, as our quotation from *Overton Park* reveals. The *Harrisburg* judge held:

> After careful and considerable examination of the Administrative Record in this case, I remain unconvinced that the Record is in such a state of clarity to make a competent judicial review of Secretary Volpe's 4(f) determination of May 18, 1970, under the law as it presently exists. Remand is therefore necessary and proper. The principal reason for this is the intervening Supreme Court decision in Citizens to Preserve Overton Park, Inc. v. Volpe, supra, which set forth the proper tests for judicial review of the Secretary's 4(f) determination, provided clear definitions of feasible and prudent alternatives, and which required remand to the District Court for plenary review of the Secretary's decision, not precluding thereby possible remand to the Secretary for compliance with the intervening DOT Order 5610.1. 330 F.Supp. at 927–28.

The concluding sentence is correct, but it cannot be read to support plaintiffs. In *Overton Park*, the Supreme Court held that the lower courts had erred in basing their review of the Secretary's action on litigation affidavits—"'*post hoc*' rationalizations," 401 U.S. at 419, 91 S.Ct. 814—rather than on the available administrative record. Remand was made for a plenary review to be based on the full administrative record before the Secretary at the time he approved the highway project. The Court then anticipated and dealt with a potential problem:

> But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.

> The court may require the administrative officials who participated in the decision to give testimony explaining their action. . . . [I]t may be that the only way there can be effective judicial review is by examining the decisionmakers themselves. See Shaughnessy v. Accardi, 349 U.S. 280, [75 S.Ct. 625, 99 L.Ed. 750] (1955).

> The District Court is not, however, required to make such an inquiry. It may be that the Secretary can prepare formal findings including the information required by DOT Order 5610.1 that will provide an adequate explanation for his action. Such an explanation will, to some extent, be a "*post hoc* rationalization" and thus must be viewed critically. If the District Court decides that additional explanation is necessary, that court should consider which method will prove the most expeditious so that full review may be had as soon as possible. 401 U.S. at 420, 91 S.Ct. at 825.

At the root of this is an implicit holding that the Secretary was under an obligation when he issued his approval to "disclose the factors that were considered . . . [and his] construction of the evidence." The intimation by the Court that the Secretary might be required by the district court upon remand to comply with the regulation is at most a reiteration of the *Thorpe* analysis: The Secretary, being put to the pains of an explanation for his failure to make findings, would suffer no imposition by being required to make the formal findings required by the regulation. *Cf. Overton Park*, 401 U.S. at 422, 91 S.Ct. 814 (Brennan, J., concurring). *Harrisburg*, in full concurrence with *Overton Park*, required this of the Secretary only after the district judge had concluded that the administrative record was sufficiently unclear to make competent judicial review impossible. Remand to the Secretary was because of this failure, not because the new regulation had come into existence.

to the district court and their filing of a *lis pendens* notice prior to the execution of the contracts at issue. Neither the filing of suit nor a *lis pendens* notice, however, requires a party being sued to stand in his tracks. The preservation of the status quo pending a final judgment is the function of a preliminary injunction. Having failed to obtain this, the plaintiffs cannot complain of activity by Lake Village after this suit was filed.[8]

■ As in *Overton Park*, that activity has led to a change in circumstance; Lake Village will feel far more than an "imposition" in the *Thorpe* sense if HUD must rescind its commitment. It follows that the Criteria have no pertinence to this case, for the regulation holds not a hint that its authors intended for it a retroactive effect.[9] Thus, we need not reach the question of whether rights have vested in Lake Village under the due process clause.

### III

■ Plaintiffs next contend that the HUD commitment was illegal notwithstanding the inapplicability of the Criteria. Illegality, they say, derives not only from a clear error of judgment on the part of Director Stevens in weighing and analyzing the facts before him, but also from a misapprehension on his part of the governing legal standard.

---

8. Plaintiffs assert their possession of "rights to the status quo ante," citing Glover v. Housing Authority of the City of Bessemer, 444 F.2d 158 (5th Cir. 1971), a case much like *Thorpe* except that the tenant-evictee had vacated her apartment. The Housing Authority urged this as a reason to distinguish *Thorpe*. The Fifth Circuit declined, stating:

> The Authority urges that *Thorpe* is distinguishable because there the tenant still resided in the housing at the time of the new regulations while here Mrs. Glover had vacated the housing. Mrs. Glover, however, left her apartment temporarily because of flooding. The Housing Authority had the locks on the apartment changed so that she could not return. Her absence therefore cannot be characterized as a voluntary relinquishment of her rights to the status quo ante. 444 F. 2d at 161.

We must frankly confess to understanding neither the argument of the Housing Authority nor its acceptance by the Fifth Circuit. *Thorpe* would have been distinguishable on the ground advanced by the Housing Authority only if the absence of Mrs. Glover from the building would have made difficult —to the point, at least, of an "imposition" upon the Housing Authority—her eviction in accordance with the HUD circular. This seems exceedingly unlikely, for the very facts of her lawsuit and appeal indicate that Mrs. Glover was readily available for eviction proceedings. In reality, the argument of the Authority is one directed to the right of Glover to sue as a tenant, and we view the ruling of the Fifth Circuit to be addressed, essentially, to that point.

9. In what is doubtless an overabundance of caution, we do not rely on the following passages of the Criteria:

> The purpose of these regulations is to set forth criteria by which the Department *will evaluate* applications for funding of housing projects under sections 235(i) and 236 of the National Housing Act, rent supplement projects and low-rent housing assistance applications under the U.S. Housing Act of 1937.
>
> \*    \*    \*    \*    \*
>
> The Department has now considered each comment received and publishes these regulations in final form to be effective February 7, 1972 (emphasis added).

Had not *Overton Park* come down, we would have disposed of the retroactivity question in this case solely on this obvious mandate of prospective effect. In cases where a statute is limited unambiguously to prospective effect, we see no reason to test, first, for an interference with antecedent rights.

While *Overton Park* did not involve an unambiguous administrative statement on the question of prospectivity, the petitioner did concede that the DOT regulation was intended to have that effect. The Court, nevertheless, found a "change in circumstances" to distinguish *Thorpe*. Perhaps the Court refused to accept the concession at face value, meaning to defer its construction of the regulation until it could do so with an assessment of retroactive impact behind it; perhaps the distinction of *Thorpe* was an alternative ground for the decision; perhaps it was dicta. If none of these are an explanation, *Overton Park* stands for the proposition that effect must be looked to no matter what a regulation may say. Taking the most conservative approach possible, we emulate the procedure followed in *Overton Park*.

In support of the last contention, plaintiffs point to the following passage of the administrative determination:

There exists a compelling need to provide low and moderate income housing for the substantial number of negroes who were displaced by the Renewal Project, as well as other low and moderate income people of the City of Chicago. The need for such housing far outweighs the speculative concern of whether the Redevelopers of Lake Village will be completely successful in their efforts to achieve the racial and economic mix sought for the Project.

If we read their argument correctly,[10] plaintiffs assert that Stevens evidenced in this passage a general conviction that the need for public housing was a factor far more important to its placement than was the possibility of increased racial segregation. We cannot concur. What Stevens did was to weigh the need for the project against the possibility of a largely black tenancy; having concluded that the latter was reasonably im-probable, he struck the balance in favor of need.[11] And if plaintiffs mean to contend that the need for public housing at a particular location may never be weighed against the possibility that segregation will be continued or exacerbated by its erection, they are contradicted by their own authority:

[W]e [are not] suggesting that desegregation of housing is the only goal of the national housing policy. There will be instances where a pressing case may be made for the rebuilding of a racial ghetto. We hold only that the agency's judgment must be an informed one; one which weighs the alternatives and finds that the need for physical rehabilitation or additional minority housing at the site in question clearly outweighs the disadvantage of increasing or perpetuating racial concentration. Shannon v. Dept. of Housing and Urban Development, 436 F.2d 809, 822 (3d Cir. 1970).

Certainly neither Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971), nor Gautreaux v. Chicago Housing Authority,

---

10. They state:

FHA Director Stevens also committed a fundamental error of law. The finding in the "Administrative Determination" that "the need for such housing far outweighs the *speculative concern*" for achieving a racial and economic mix (App. 2) is simply not the standard to be applied under the National Housing Act and 1968 Civil Rights Act. . . . [T]he concern for integrated, open housing must be of fundamental importance to federal housing officials. The casual dismissal by FHA Director Stevens of the question of whether Lake Village would be successfully integrated as one of only "speculative concern," displays his total misconception of his obligations under the national housing policy. His views in this regard vitiate entirely the validity of the findings of his "Administrative Determination." App. Br. at 19, 20.

11. This is made amply clear to Stevens' discussion of the issues:

The objectors to the FHA Project seem to imply that desegregation of housing is the only goal of the national housing policy. Of importance, too, is the obligation to provide every person with a decent, safe and sanitary place in which to live. When a compelling need for such housing exists, it may even have to be built in a racial ghetto. This proposition was underscored in the President's Statement [On Federal Policies Relative to Equal Housing Opportunity,] which included the following pertinent observation:

"This does not mean no federally assisted low and moderate income housing may be built within areas of minority concentration."

Of course, Hyde Park-Kenwood is neither a ghetto, nor an area of minority concentration. Given the crucial need for housing in the City of Chicago, it is reasonable to permit this isolated Federal assisted building in an interracial area to proceed even though there is some risk that racial imbalance in occupancy will obtain, especially where the net result will tend to balance the overall ratio of white and black inhabitants in the community rather than exacerbate racial concentration.

His admission of "some risk that racial imbalance in occupancy will obtain" must be read in light of an earlier conclusion:

[T]here is a reasonable basis to conclude that the several groups which the FHA Project could reasonably be expected to attract would result in a reasonable racial occupancy mix.

296 F.Supp. 907 (N.D.Ill.1969), stands for the proposition that public housing may not be erected in or at the border of a racial ghetto. Indeed, when the latter case came before the district court for a ruling on remedy, it was specifically held that ghetto placement was permissible provided that public housing in white areas was likewise erected. Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736 (N.D.Ill.1969). See *generally*, Note, Public Housing and Urban Policy; Gautreaux v. Chicago Housing Authority, 79 Yale L.Rev. 712, 717–18 and sources at 718 nn. 16, 17 (1970).

■ We turn to a review of the administrative factual findings. Our inquiry must be a narrow one. 5 U.S.C. § 706(2)(A). As was stated in *Overton Park:*

> Scrutiny of the facts does not end . . . with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. 401 U.S. at 416, 91 S.Ct. at 824.

We are not charged, moreover, with determining whether the administrative findings are supported by substantial evidence. Just the opposite is the case. Were we to require that substantial evidence support Stevens in his determination, we would overstep the careful mandate of the Administrative Procedure Act. *Compare* 5 U.S.C. § 706(2)(A) *with* 5 U.S.C. § 706(2)(E).

The decision by the Director to maintain his commitment to Lake Village was based upon three separate conclusions. He found, first, a substantial probability that the Lake Village project would be adequately integrated when erected and rented. Assuming that the opposite would come to pass, Stevens concluded that "no significant impact upon the stability or racial concentration of Hyde Park-Kenwood" would result. He found, finally that the project was greatly needed by low income residents of the area.[12]

---

12. *Compare* Graves v. Romney, No. 19474–2 (W.D.Mo., April 6, 1973), a case which plaintiffs wrongly cite as authority for a restraint of HUD in this case. In *Graves*, the district court found these facts with reference to another HUD commitment:

> [A]ll of the evidence in this case as to whether or not the HUD officials considered any racial or sociological information to determine whether the selection of this site complied with the 1964 and 1968 Civil Rights Acts came from the files and testimony of the HUD officials. There is no evidence whatsoever that any institutionalized method was used or even considered. The overwhelming weight of the evidence *from the defendants' own witnesses is* that they had the money available to approve four or five projects in the Kansas City Metropolitan Area before June 30, 1973, or they would "lose" the money. The evidence further indicates that their sole concern was economic feasibility of the projects to be approved and that they totally disregarded all other considerations. There was no contact made with a single resident of the area of the proposed location, nor with any of the planning commissions of the City of Kansas City. There was no investigation of the school situation, either in regard to overcrowding or in regard to racial balance and the impact of a large project such as this in the school district. The one staff member who could possibly claim to even have the responsibility of looking into considerations affecting racial problems, urban blight and the effect of such a project on the question of segregation was an employee whose duties were bureaucratically labeled "Equal Opportunity Division." He started work in this capacity in December of 1970 and prior to that had been a laboratory analyst for Procter & Gamble. Previous to that he had been a real estate salesman and an apartment house manag-

Plaintiffs attack the decision on all fronts. It is said that the facts do not support Stevens in any of his conclusions, particularly the one regarding the probability of an integrated project. In support, the plaintiffs state that Stevens "totally ignored" certain facts, most notably these:

No housing project subsidized under Section 221(d)(3) of the National Housing Act (the predecessor to Section 236) in the vicinity of Lake Village is less than 90% black in occupancy, including one project (Greenwood Park) built by the defendant LVA and managed by the defendant Draper & Kramer, as well as two others managed by Draper & Kramer. *Prior to* the rent-up of Greenwood Park, defendant LVA stated that the racial balance achieved at that project would have a lot to do with the racial balance of Lake Village. . . . By the time of Stevens' "Administrative Determination," however, *Greenwood Park was substantially all-black in occupancy.*

Like the Lake Village project, Greenwood Park is located on the south side of 47th Street but a few blocks west, and was developed by the same defendant Lake Village Associates, managed by the same defendant Draper & Kramer, and is subsidized as a moderate income development by these same federal defendants. Greenwood Park has a 91% black occupancy; although located in a census tract (3905) that is only 72% black.

Stevens' reliance in the "Administrative Determination" on the design emphasis of the project on efficiency and one bedroom units "calculated to attract elderly and young married couples" is totally undetermined by his failure to consider that the presence of 18 efficiency apartments and 151 one bedroom apartments in the completed Section 221(d)(3) projects in the Lake Village area has not prevented *those* developments from achieving an overall black occupancy of at least 95%. App.Br. at 18, 19.

We cannot agree that these facts were overlooked.[13] Stevens was well aware of nearby failures at integration, as is apparent from a memorandum which he received from the Economic and Market Analysis Division of HUD on July 23, 1971. That report detailed previous FHA occupancy experience and made a number of suggestions for enhancing the possibility of an integrated Lake Village project. The great majority of these ideas were incorporated into Stevens' final ruling:

In response to a request by the Chairman of the Conference for compromise proposals, the representatives of the Redevelopers have volunteered to accept a waiver by the Government of the Section 236 income limitations for any number of the units which HUD in its discretion should determine. Since such offer will enhance the probability of a racial mix in the tenancy of the Project, it is hereby determined that the Section 236 income limitations be waived for not more than twenty percent of the Project

---

er. His testimony, both by deposition and at the trial, clearly indicated that he had no conception of, and gave no consideration to, the adverse effects on the neighborhood that could possibly result from the location of this low income housing, on what he himself termed "the periphery" of the black belt.

13. Also attacked is Stevens' ignorance of these facts:

Lake Village is located on the northern boundary of a census tract having a 42.-

4% Black population and is immediately across the street from an all-Black area.

Prior to the time when plaintiffs first objected to Section 236 funding for this development, FHA characterized the location of the project as "an area of minority concentration."

Stevens, however, was clearly aware of the first fact. As to the second, Stevens had before him the facts upon which a similar finding could have been based. Surely he was not estopped to disregard the earlier finding, if he did so in fact.

units developed with Federal assistance.

In order to further enhance the probability of said racial mix, it is hereby further determined to permit the utilization of exception income limits for all two-bedroom units in the Project Tower developed with Federal assistance.

The Redevelopers of the Project are directed to submit to the Chicago FHA Insuring Office, prior to initial endorsement of the Mortgage Note, their written agreement to stage the development of the low-rise Project units (18 three-bedroom units) in order to delay their availability until the high rise Project units have been rented.

He also required this of Lake Village:

The Redevelopers shall submit for HUD approval within twenty days from the date hereof, a detailed plan of tenant selection procedures devised to attain the maximum possible racial mix in the occupancy of the Project, in furtherance and in implementation of the tenant selection policy set forth in Volume I of its Memorandum to the undersigned.

That memorandum set out an extensive, though somewhat general, program to "attract applicants of all races" through promotional activities, advertising, and tenant recruitment. It thus appears that Stevens did considerably more than passively accept the estimate by Lake Village of eventual integration; aware of the problems and failures of the past, he sought to improve thereon with a fresh approach. That his efforts bore some risk of failure is not, we think, reason enough to overturn them as a product of a clear error of judgment.[14] It follows that the concern of plaintiffs for a segregated project was, on this record, arguably speculative and that Stevens did not err in looking to the issue of need for a counterweight.

Plaintiffs attack the finding of need on the ground that all of the persons displaced in the original urban renewal effort had been relocated as of December 31, 1970. Stevens, however, did not base his assessment of need solely on the urban renewal displacement nor was he willing to accept as adequate the relocation sites:

The black population of Chicago is increasing in both percentage and absolute terms. If low and moderate income minorities are displaced by urban renewal and not permitted to live in clearance areas because of high rents and white areas are closed to them—they are forced only to settle in other areas of high black concentration where the housing stock is either substandard or marginal. Such areas then become over-crowded, the conditions of slum and blight emerge, and the urban renewal cycle begins anew.

As with this finding of probable integration, we see no clear error on the part of Stevens. The administrative decision stands on these two grounds and we need not reach the question of whether Stevens erred in finding that an all-black project would have, at worst, a *de minimis* effect on the racial balance of Hyde Park-Kenwood.

### IV

■ Plaintiffs cite Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970), as authority for their

---

14. Plaintiffs also make this point:

The finding that the project was designed to achieve a reasonable racial mix was totally refuted by the facts of record, most of which Stevens ignored. The finding is apparently based on the statement in the "Administrative Determination" that there are present in the area "white senior citizens, young married students with no children, graduate students, and junior members of the academic community—all with-

in eligible income ranges." *Nowhere in the record, however, was there any factual support for this statement.* App. Br. at 17.

This is to be distinguished from their attack on "Stevens' conclusion concerning the probable racial mix of Lake Village, when occupied," App. Br. at 17, and we reject it for that reason. If the project will be integrated, it can make no difference what its original design objects were.

complaint that they were denied due process in their appearance before HUD. Director Stevens, they claim, was not an impartial decisionmaker and erred in not allowing their cross-examination of witnesses.[15] They must do more than cite *Goldberg*, however, to prevail on their contention, for *Goldberg* was a very different case from this. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands. . . . Its flexibility . . . is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

It is curious, indeed, to find the plaintiffs arguing for advanced procedural protections in a context where their right even to a hearing is open to question. *Shannon* had this to say:

Plaintiffs urge that some sort of adversary hearing or at least an opportunity for residents in the area to be heard should be required. They rely on the district court decision in Powelton Civic Home Owners Ass'n v. HUD, [284 F.Supp. 809 (E.D.Pa. 1968)]. Without suggesting how this court would rule on the *Powelton* situation, we think a case involving the adequacy of relocation procedures which are dealt with specifically in the Housing Act of 1949, 42 U.S.C. § 1455(c), is distinguishable from the more general problem of racial concentration presented here. In this case the judgment to be made by HUD is quasi-legislative. So long as it adopts some adequate institutional means for marshaling the appropriate legislative facts the rights of affected residents will be adequately protected, we think, by the opportunity to obtain judicial review pursuant to the Administrative Procedure Act after the agency decision. For deliberately discriminatory action by a LPA there are other ad-

versary type remedies available. 436 F.2d at 821.

Perhaps in recognition of this, plaintiffs conceded at oral argument that no authority bore directly on their claim. They argued, nevertheless, that we might make a ruling limited to the parties and facts of this case. Taking this approach, we decline their invitation.

In their quest for a right of cross-examination, plaintiffs suggest that the administrative determination involved the resolution of "complicated and disputed questions of fact—whether the Section 236 subsidy for Lake Village would lead to an increase in racial concentration." App.Br. at 33. It is apparent, however, that Stevens accepted most, if not all, of the facts which plaintiffs offered and which they say he ignored. The real question is whether the measures which Stevens took to prevent a repetition of the failures at similar, nearby projects were adequate to serve that end. Plaintiffs raise no objections to the commitment modifications—other than to term them, without support, "woefully inadequate"—and we must conclude that plaintiffs had little need for cross-examination. The modifications to the HUD commitment are much like the CAB regulation in American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S.App. D.C. 310, 359 F.2d 624 (1966), and the words of the court of appeals in that case have bearing here:

The particular point most controverted by petitioners is the effect of the CAB regulation on their business. The issue involves what [one scholar] calls "legislative" rather than "adjudicative" facts. It is the kind of issue involving expert opinions and forecasts, which cannot be decisively resolved by testimony. It is the kind of issue where a month of experience will be worth a year of hearings. 359 F.2d at 633.

*See also* Hahn v. Gottlieb, 430 F.2d 1243, 1246–1249 (1st Cir. 1970); Moore-Mc-

---

15. They also cite the failure of Stevens to grant them "such minimal safeguards as access to information, transcription, . . .

and a copy of the developer's written presentation prior to the conference." App. Br. at 33. There is no authority to accompany this.

Cormack Lines, Inc. v. United States, 188 Ct.Cl. 644, 413 F.2d 568, 590 (1969).

With respect to plaintiffs' claim of partiality to Lake Village by Stevens, we find that the record does not bear them out. In response to a letter of objection to the HUD commitment by the plaintiff SECC, Stevens stated on May 3, 1971:

> Inasmuch as we have already issued a commitment on subject proposal after a great deal of expense by the proponents and since it is adjudged as needed and feasible by this office, we cannot at this time morally rescind this commitment.

A few days later, he made what plaintiffs concede to be a restatement of this position: "[W]e cannot *arbitrarily* rescind a commitment which has been issued" (emphasis added). An opposition to administrative arbitrariness is hardly a position which evidences prejudice in favor of Lake Village. As his letter of May 28, 1971 reveals, Stevens was open to plaintiffs' criticism.[16] Plaintiffs would attach significance, lastly, to testimony that Stevens came into a meeting of HUD personnel "with his decision and with his mind made up." This is scant evidence of prejudgment, however, for the HUD meeting took place after plaintiffs had conferred with HUD. Stevens can hardly be faulted for having reached a conclusion on the basis of what came to light at and pursuant to that conference.

### V

Our last task is to assess plaintiffs' contention that their contractual claim against the City and Lake Village was deserving of a summary judgment in their favor, or, at least, of a trial on a genuine issue of material fact.

Lake Village became obligated to the City by an assignment of a redevelopment contract between the United Dwelling Foundation and the City. In return for certain parcels of land, including HR–1B, to be conveyed directly to Lake Village by the City upon payment of the purchase price, Lake Village agreed "to assume all of the obligations of the Redevelopers [United Dwelling Foundation]" under the redevelopment contract and "to be subject to all the conditions and restrictions to which the Redevelopers are subject thereunder." One of those conditions was this:

> The terms and conditions of the Offer, the Instructions to Bidders, and Department of Urban Renewal Resolution No. 67—DUR–85 are made a part of this Contract and incorporated by reference thereto.

It is the contention of plaintiffs that the urban renewal resolution bound Lake Village to comply with the original offer it made for development of the entire site. This argument is without merit.

The resolution states in part:

> Whereas, the [United Dwelling Foundation and Lake Village] have entered into a Memorandum Agreement in regard to their proposals to overcome the incompatible features of the same; and
>
> Whereas, the Department of Urban Renewal has reviewed said Memorandum Agreement and finds that said Agreement will effect a satisfactory solution; and
>
> \*   \*   \*   \*   \*   \*

---

16. The letter states in pertinent part:

First, I want to re-emphasize that my letter of May 3 was not to be taken as a formal rejection of the request of the South East Chicago Commission to reconsider the present commitment for Section 236 mortgage insurance on the above project. Further we have discussed this matter with the HUD Regional Office and offer the following comments and proposal.

This Department has not adopted procedures or regulations providing for administrative hearings or adversary proceeding in connection with the claim you have raised. However, whenever an interested party files a claim such as yours, careful consideration of such a claim must become a part of our decision making process. Under the circumstances, this office is prepared to convene a conference of all interested parties at which each will be given an opportunity to express concerns and exchange views.

Whereas, in consideration of the terms of the Memorandum Agreement between said offerors, [Lake Village] has withdrawn its offer to purchase said parcels:

\*   \*   \*   \*   \*   \*

The approval conferred by this Resolution is further contingent upon the land contract for sale of said . . . Parcels between the City of Chicago and [United Dwelling Foundation] *providing that* [United Dwelling Foundation] *convey a part of parcel HR–1 and parcels LR–1 through LR–3 to* [Lake Village] *for redevelopment in accordance with their proposal* for the price paid for same by [United Dwelling Foundation] and that said [Lake Village] purchase and redevelop said parcels under the same conditions and covenants required by the City under its land contract with [United Dwelling Foundation] (emphasis added).

Plaintiffs assert—despite the recitation that Lake Village "has withdrawn its offer"—that the word "proposal" in the italicized phrase refers to the original Lake Village offer.[17] Lake Village and the City contend that "proposal" refers to the memorandum agreement between Lake Village and United Dwelling Foundation to which reference is made throughout the urban renewal resolution, an agreement which makes no reference to the original offer of Lake Village. We agree with the defendants, for the opposing interpretation is inconsistent with the use in the resolution of the pronoun "their" to modify "proposal." Where Lake Village is referred to by a pronoun elsewhere in the resolution, the singular form is used. Thus, the pronoun "their" must refer to Lake Village and one or more additional parties. This would make no sense if "proposal" was meant as a reference to the original Lake Village offer, for Lake Village alone was a party to that.

Plaintiffs suggest that this contractual arrangement left Lake Village free of the "elaborate controls [which the City] had previously established on ultimate development of the property." Reply Br. at 24. The short answer to this is contained in the redevelopment contract, where numerous provisions granting the City control over construction by Lake Village are set out, as well as in the urban renewal resolution itself, where Lake Village is required to "redevelop . . . under the same conditions and covenants required by the City under its land contract" with the United Dwelling Foundation.

The summary judgment entered by the district court is affirmed.

---

17. This offer did not contemplate the erection of a project with federal assistance.