669 F.2d 468
 5 Collier Bankr.Cas.2d 1290, 8 Bankr.Ct.Dec. 880,
Bankr. L. Rep. P 68,549
 In the Matter of Willis R. GIFFORD and Jacqueline M.
Gifford, Bankrupts. Appeal of THORP FINANCE
CORPORATION, United States of America,
Intervenor-Appellee.
 No. 81-1174.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 21, 1981.
Decided Jan. 21, 1982.
 
 Mustapha Muhammad, ITT Consumer Financial Corp., Henry F. Field, Minneapolis, Minn., for bankrupts.
 Michael J. Lund, Frisch, Dudek & Slattery, Ltd., Milwaukee, Wis., for intervenors-appellees.
 Robert L. B. Bombaught, pro se.
 Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and DUMBAULD, Senior District Judge.*
 PELL, Circuit Judge.
 
 
 1
 This is a direct appeal from an order of a three-judge panel Bankruptcy Court, 7 B.R. 814, which discharged the defendant-appellant Thorp Finance Company's (Thorp) nonpossessory, nonpurchase-money security interest in specific items of household property and goods of the plaintiffs-appellees Willis and Jacqueline Gifford pursuant to 11 U.S.C. § 522(f)(2). The issue on appeal is whether Congress intended § 522(f)(2) to apply to security interests acquired prior to November 6, 1978, the date of enactment of the Bankruptcy Reform Act, and whether such retroactive application would be constitutional.[1]
 
 I.
 
 2
 The facts were stipulated by the parties below and are not in dispute. On October 4, 1978, Thorp entered a contract with the Giffords pursuant to which Thorp lent the Giffords $2,933.89 (exclusive of finance costs) in exchange for a promise of repayment and a nonpossessory, nonpurchase-money security interest in certain specific items of household furniture. The Giffords filed a petition in bankruptcy on June 9, 1980, in which they claimed exemption under § 522(d)(3) of the Bankruptcy Act for up to $200 in value for each item of their household property. They also filed a complaint under § 522(f)(2) to avoid Thorp's security interest in the furniture. Thorp opposed the complaint on the grounds that application of § 522(f)(2) to pre-enactment liens would be unconstitutional.
 
 
 3
 The complaint was heard by a panel of three bankruptcy judges. That panel ruled that retroactive application of § 522(f)(2) passed constitutional muster. The court relied heavily on the legislative history of the Act, and inferred an intent to have § 522(f)(2) apply retroactively from the clear expression of the remedial legislative purpose. The court also noted the general presumption of constitutionality of statutes, and determined that because § 522(f)(2) was limited to particular categories of exempted property it was protected by that presumption. Thorp appealed from that decision. The United States requested leave to intervene which was granted by this court on May 28, 1981.
 
 II.
 
 4
 Thorp asserts on appeal that the court below erred both in determining that it was the intent of Congress that § 522(f)(2) apply retroactively, and also in determining that such application is constitutional. It contends that retrospective application of § 522(f)(2) would violate the "taking" clause of the Fifth Amendment,[2] and that the statute should therefore be construed prospectively only, in light of the well-settled canon of construction that statutes not be construed to violate the Constitution if any other possible construction is available.
 
 
 5
 In NLRB v. Catholic Bishop, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Supreme Court emphasized the proper mode of analysis of a Congressional enactment which is claimed to be unconstitutional. The Catholic Bishop Court had before it the question of whether lay teachers in church-operated schools were within the jurisdiction of the NLRB. The Court found that neither the language nor the legislative history of the National Labor Relations Act disclosed "an affirmative intention ... clearly expressed," that the NLRB have such jurisdiction. Absent such clear expression of Congressional intent to bring teachers within the NLRB's jurisdiction, the Court declined to construe the Act in a manner that would require the resolution of "difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." 440 U.S. at 507, 99 S.Ct. at 1322. We turn first, therefore, to examination of whether retroactive application of § 522(f)(2) would give rise to such serious constitutional questions under the Fifth Amendment.
 
 III.
 
 6
 The Constitution confers broad powers upon Congress to establish "uniform Laws on the subject of Bankruptcies." U.S.Const. art. I, § 8, cl. 4. Congress has acted under this broad grant to enact various statutes which have applied to rights which predated their enactment. See, e.g., Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902) (Bankruptcy Act of 1898 discharged plaintiff's 1892 judgment against debtor); In re Prima Co., 88 F.2d 785 (7th Cir. 1937) (Congress intended Bankruptcy Code to confer on bankruptcy courts the power to issue trustee certificates with priority over existing mortgages).
 
 
 7
 The Bankruptcy Reform Act of 1978, a comprehensive revision of the entire bankruptcy system, was enacted in the exercise of this broad bankruptcy power. It applies to many rights and transactions which took place before its enactment, saving only those cases commenced under the old bankruptcy law. See, e.g., 11 U.S.C. § 365(b)(2) (invalidates bankruptcy clauses in executory contracts and unexpired leases); 522(e) (makes contractual waivers of exemptions unenforceable by unsecured creditors); 524(c) (contractual reaffirmations of debts unenforceable in some circumstances).
 
 
 8
 Courts have acknowledged the scope of the bankruptcy power as extending to all legislation regarding the discharge of contractual debts and distribution of the debtor's assets. See, e.g., Kuehner v. Irving Trust Co., 299 U.S. 445, 451, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937); Hanover National Bank, 186 U.S. at 186, 22 S.Ct. at 859. It is also settled, however, that the bankruptcy power is not without limitation, but rather is subject to the constitutional limits of the Fifth Amendment. Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935); Rodrock v. Security Industrial Bank, 642 F.2d 1193, 1197 (10th Cir. 1981), prob. kuris. noted, --- U.S. ----, 102 S.Ct. ----, 70 L.Ed.2d ---, 50 U.S.L.W. 3486 (U.S. Dec. 14, 1981) (No. 81-184); In re Penn Central Transportation Co., 494 F.2d 270, 278 (3d Cir. 1974), cert. denied, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122. The focus of our inquiry at this juncture must be whether application of § 522(f) (2) to pre-enactment liens presents a significant risk of overstepping those constitutional limitations.
 
 
 9
 In Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), the Supreme Court found that the Frazier-Lemke Act of 1934, which by its terms applied retroactively, conflicted with the Fifth Amendment, and was therefore void. The Act was designed to save family-owned farms from foreclosure by permitting a debtor to obtain a five-year stay of state foreclosure proceedings, to remain on the farm during the stay if he paid a reasonable rent, and to satisfy the mortgagee's claim at any time within the five-year period by paying the mortgagee the appraised value of the property.
 
 
 10
 The Radford Court noted the broad power of Congress to discharge a debtor's personal obligations, but concluded:
 
 
 11
 the effect of the Act here complained of is not the discharge of ... personal obligation. It is the taking of substantial rights in specific property acquired by the Bank prior to the Act.
 
 
 12
 ....
 
 
 13
 The province of the Court is limited to deciding whether the ... Act ... as applied has taken from the Bank without compensation, and given to Radford, rights in specific property which are of substantial value.... As we conclude that the Act as applied has done so, we must hold it void. For the Fifth Amendment commands that, however great the Nation's need, private property shall not thus be taken even for wholly public use without just compensation.
 
 
 14
 295 U.S. at 589-90, 601-02, 55 S.Ct. at 863-64.
 
 
 15
 A substantial number of courts, including the only court of appeals to rule on the issue now before us, have applied the Radford rationale to invalidate § 522(f)(2). See, e.g., Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), prob. juris. noted, --- U.S. ----, 102 S.Ct. ----, 70 L.Ed.2d ---, 50 U.S.L.W. 3486 (U.S. Dec. 14, 1981) (No. 81-184); Cashion Community Bank v. Carnes, 8 B.R. 599 (Bkrtcy.W.D.Okla.1981); In re Pape, 7 B.R. 443 (Bkrtcy.N.D.Fla.1980); Malpeli v. Beneficial Finance Co., 7 B.R. 508 (Bkrtcy.N.D.Ill.1980); Oldham v. Beneficial Finance Co., 7 B.R. 124 (Bkrtcy.D.N.M.1980); Pierce v. Oklahoma Health Services Federal Credit Union, 4 B.R. 671 (Bkrtcy.W.D.Okla.1980); Hawley v. Avco Financial Services, 4 B.R. 147 (Bkrtcy.D.Or.1980). A similar number of district courts have upheld the validity of the section, relying primarily on an expansive conception of the bankruptcy power, and a due process, rather than a takings, analysis. See Note, Constitutionality of Retroactive Lien Avoidance Under Bankruptcy Code Section 522(f), 94 Harv.L.Rev. 1616, 1621 & nn. 36-42 (1981).
 
 
 16
 In Rodrock, the U.S. Court of Appeals for the Tenth Circuit was faced with precisely the issue presented here, and determined that under Radford, § 522(f) was unconstitutional. That court reasoned:
 
 
 17
 In the instant cases, the creditors acquired rights in specific property prior to the enactment of the Reform Act, and, under Radford, these vested rights cannot be taken from the creditor for the benefit of the debtor. It should be noted that, in the instant cases, there would be a complete taking of the secured creditors' property interest.
 
 
 18
 642 F.2d at 1197. The Rodrock court was also faced with the argument raised by the debtors here, that Radford has been discredited by a series of subsequent Supreme Court decisions. As the Giffords point out, Radford did not expressly rely on the taking clause of the Fifth Amendment, although the language of the opinion of the Court would seem to so indicate. Subsequent Supreme Court cases have seemed to treat Radford as a substantive due process case, and are silent on the taking issue. Wright v. Union Central Life Insurance Co., 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); Wright v. Vinton Branch, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); see Helvering v. Griffiths, 318 U.S. 371, 400-01 n.52, 63 S.Ct. 636, 652 n.52, 87 L.Ed. 843 (1943). While these later cases do indeed circumscribe the application of Radford, and erode the substantive due process test it arguably applied, it is also clear that, "The Supreme Court ... has never repudiated the principle that the value of a security interest in specific property is a fifth amendment property right that cannot be taken unless just compensation is given." Note, 94 Harv.L.Rev., supra, at 1624. The Supreme Court has continued to cite Radford for the proposition that the Government may not take a property interest without just compensation. See, e.g., Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). It is also worthy of note, although perhaps not conclusive, that Congress apparently considered Radford still vital at the time of the passage of the Bankruptcy Reform Act. S.Rep.No.95-989, 95th Cong., 2d Sess. 49, 76, reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5835, 5862 (citing Radford with approval); H.R.Rep.No.95-595, 95th Cong., 2d Sess. 361, reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6317. We therefore agree with the Rodrock court that subsequent Supreme Court decisions, "may well refine ..., but ... do not destroy the fundamental teaching of Radford that Congress may not under the bankruptcy power completely take for the benefit of a debtor rights in specific property previously acquired by a creditor." 642 F.2d at 1198.
 
 
 19
 The continuing vitality of Radford raises substantial and significant questions about the constitutionality of any retroactive application of § 522(f)(2). Specifically this court would be required to determine whether the liens avoided are compensable property rights within the meaning of the taking clause of the Fifth Amendment; whether avoidance of the liens constitutes a sufficient deprivation of the creditor's property to invoke the protections of the Fifth Amendment; and whether substitution of an unsecured claim for the creditor's rights in specific property is sufficient compensation. Because we see no escape from these serious Fifth Amendment questions if § 522(f)(2) is applied to liens which attached under state law to specific property prior to the enactment date of the Bankruptcy Reform Act, we turn to an examination of the Act to decide whether it must be read to so apply, and thus require resolution of the constitutional question raised by Thorp.
 
 IV.
 
 20
 The language of § 522(f)(2) does not expressly address retroactive application of the provision. There is thus no explicit "clear expression of an affirmative intention of Congress," Catholic Bishop, 440 U.S. at 504, 99 S.Ct. at 1320, that preenactment liens be avoided by the section. As the debtors and the Government properly point out, however, the broad sweep of the Reform Act affects many rights and obligations which arose before the enactment date, and expressly excepts from coverage only cases commenced under the old Bankruptcy Code. Examination of the legislative history is therefore necessary to determine whether the broad sweep of the Act was intended to include the avoidance of pre-enactment liens under § 522(f)(2).
 
 
 21
 The Bankruptcy Reform Act of 1978 was the product of extensive study and debate. Among its purposes was provision of more effective relief to consumer debtors, whose ranks had swelled substantially since 1938, the last major revision of the Act. H.R.Rep. 95-595, 95th Cong., 2d Sess. 4, reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 5966; see In re Smith, 640 F.2d 888 (7th Cir. 1981).
 
 
 22
 Among the methods chosen to provide this protection were the lien avoidance provisions of § 522(f)(2), which permit a debtor to avoid the fixing of a lien on an interest of the debtor which would otherwise be exempt under § 522(b), if the lien is a nonpossessory, nonpurchase-money security interest in certain types of property, including household furnishings and goods of the type at issue here. Although the legislative history is silent as to whether such avoidance is intended to apply to pre-enactment liens, the rationale for the provisions is set forth at length. Congress found that although the resale value of such household goods is negligible, their replacement cost is high. The lien's primary value to the creditor is thus as a threat, used to coerce debtors into making payments they cannot afford in order to retain basic household necessities. Congress found that the widespread use of such liens, which were often obtained without debtor knowledge of the consequences, impaired the fresh start bankruptcy was intended to provide; it thus determined to allow the avoidance of such liens. H.R.Rep.No. 95-595, 95th Cong., 2d Sess. 126-127, reprinted in (1978) U.S.Code Cong. & Ad.News 5963, 6087-88.
 
 
 23
 Although the legislative purpose in enacting § 522(f)(2) is quite clear, there is no express indication in the legislative history that Congress intended to apply the section to vested property rights in existence at the time of enactment. Nor is such an inference compelled from the legislative history. Rather, Congressional sensitivity to the Fifth Amendment limits of the bankruptcy power is reflected by repeated reference to the Radford decision, in both the House and Senate reports accompanying the Act, see supra. This demonstration of Congressional recognition of the limits of the bankruptcy power to deprive creditors of property rights, as well as the absence of any clearly expressed affirmative intention that § 522(f) apply to liens which had attached prior to the enactment of the Bankruptcy Reform Act compels the conclusion that Congress did not contemplate application of § 522(f)(2) to liens in existence prior to November 6, 1978.
 
 
 24
 The debtors and the Government nevertheless argue that the legislative history demonstrates the remedial and curative purpose of the enactment, and that limiting application of § 522(f)(2) to post-enactment liens would nullify the broad Congressional intent. Furthermore, they argue, if § 522(f)(2) does not apply to pre-enactment liens, there would be a statutory gap, whereby in a case filed after October 1, 1979, no bankruptcy law would cover creditors' security interests which came into being before that date, because the old bankruptcy law was repealed as of that date, and that Congress could not have intended such a result.
 
 
 25
 The debtors and the Government first point out that the purpose of the statute is to remedy past abuses of such liens by creditors. They rely on McNair v. Knott, 302 U.S. 369, 371, 58 S.Ct. 245, 246, 82 L.Ed. 307 (1937), to establish the principle that such remedial legislation is presumed to apply retroactively in the absence of express limitation to prospective application. Thorp conversely relies on Greene v. United States, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964), and South East Chicago Commission v. HUD, 488 F.2d 1119, 1122 (7th Cir. 1973), to establish a contrary canon: that in the absence of a clear mandate of the legislative body to the contrary, statutes generally are presumed to operate only upon acts subsequent to their passage. Rather than resort to weighing these conflicting canons of statutory construction to ascertain legislative intent, we find the proper mode of analysis in this situation to be determination whether the preservation of pre-enactment liens is a sufficiently strong interest that the legislature could not, in the absence of specific language, have intended to destroy it. See, Greenblatt, Judicial Limitations on Retroactive Civil Legislation, 51 Nw.U.L.Rev. 540, 550, 553.
 
 
 26
 As noted above, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), held that retroactive application of the Frazier-Lemke Act to destroy creditors' property rights in land was unconstitutional. The debtors and the Government contend that this case differs from Radford in that the resale value of § 522(f) property is minimal, is not in reality relied upon as commercially valuable security, and therefore does not rise to the level of the "rights of substantial value" protected by the Radford Court. They argue such "quantification" is required for a Fifth Amendment taking analysis, and that unless property has sufficient dollar value, rights in it are not protected. We disagree. The fact that the value of § 522(f)(2) items may be less than the debt they secure does not make the security interest worthless, and it is the value of that right which is at issue, not the worth of the collateral. Creditors take security to insure repayment, not primarily to substitute collateral for repayment. The fact that § 522(f)(2) creditors are perhaps more interested in repayment than in substitution of collateral than other creditors may be does not make them different from other creditors in any Fifth Amendment sense. A property right is of value regardless of the worth of the object in which it is held, and is protected from governmental appropriation by the taking clause of the Fifth Amendment. Hoops v. Freedom Finance, 3 B.R. 635, 6 B.C.D. 273, 276 (Bkrtcy.D.Colo.1980), aff'd, Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), prob. juris. noted, --- U.S. ----, 102 S.Ct. ----, 70 L.Ed.2d ---, 50 U.S.L.W. 3486 (U.S. Dec. 14, 1981) (No. 81-184). We find that the interest in preserving preenactment liens is a strong one which rises to constitutional magnitude. In the absence of express legislative intent to destroy such interests, we decline to believe retroactive application to have been within the contemplation of Congress.
 
 
 27
 Nor are we persuaded that limiting application of § 522(f)(2) to liens created after November 6, 1978, will create a statutory gap in the bankruptcy laws. But cf. Rodrock, 642 F.2d at 1196-97 (existence of gap means retroactive intent must be inferred). Such a gap would only exist if a provision similar to § 522(f)(2) had existed under the old bankruptcy act. Prior to October 1, 1979, there was no such provision, however, and thus giving § 522(f)(2) prospective effect only simply means that the power of avoiding liens under its provisions will take effect on October 1, 1979, and apply to all liens arising after that date. Liens created prior to that date will continue to be effective under state law-precisely as they were under the old Bankruptcy Act.
 
 V.
 
 28
 Accordingly, in the absence of any clear expression of legislative intent to apply § 522(f)(2) retroactively, we decline to construe the section in a manner that would call upon the courts to resolve thorny and troublesome questions under the taking clause of the Fifth Amendment. We hold that § 522(f)(2) does not apply to liens which attached prior to November 6, 1978.[3] The judgment below is therefore
 
 
 29
 Reversed.
 
 
 30
 CUMMINGS, Chief Judge, dissenting.
 
 
 31
 I disagree with the opinion of the majority. In my judgment Congress intended Section 522(f)(2) to be applied "retroactively" and such application will not violate the Fifth Amendment prohibition against taking private property for public use without just compensation. Because the Congressional intent concerning the application of Section 522(f)(2) is so clear, the majority has done a disservice by failing to resolve directly the harder issue of whether that provision involves an uncompensated taking. Instead, the majority's opinion determines only the diluted issue of "whether retroactive application of § 522(f)(2) would give rise to * * * serious constitutional questions under the Fifth Amendment" or "present a significant risk of overstepping those constitutional limitations" (at p. 470). Although it is of course prudent policy to construe ambiguous statutes constitutionally, there are limits to fair construction, and when as here the proposed construction would substantially postpone the statute's intended operation, the constitutional motive should be fully articulated.[1]
 
 
 32
 I. Congress Intended Section 522(f)(2) to Apply to This Type of Pre-enactment Lien.
 
 
 33
 The first question is whether Section 522(f)(2)[2] lets debtors avoid the Wisconsin security interests it describes although they attached prior to its enactment. Like the other substantive provisions of the 1978 Bankruptcy Act, Section 522(f)(2) does not state when it, as opposed to the rest of the Act, is to apply. Congress did not adopt the habit of scattering throughout the statute its directions for time of application. Rather, all temporal clues were compendiously posited in Title IV of the Act. Thus Section 401 of Title IV provides that all former laws relating to bankruptcy are repealed. Section 402(a) states that "(e)xcept as otherwise provided in (Title IV), this Act shall take effect on October 1, 1979." The combined effect of Sections 401 and 402(a) is to provide as substantive law only the new Act for cases commenced on or after October 1, 1979. See generally 1 Collier on Bankruptcy P 7.02 (15th ed. 1980). Since Title IV provides no exceptions for Section 522(f) (2), that Section must apply to cases filed after the effective date.
 
 
 34
 Nevertheless, several arguments have been advanced for not applying Section 522(f)(2) in cases filed after the effective date with regard to security interests created prior to enactment of the statute. The first argument, essentially adopted by the majority opinion, is that such application could amount to an unconstitutional taking. That argument will be dispelled as a corollary to the discussion in the next part of this opinion concerning the taking question. A related argument, that by "repeated reference to the Radford decision" Congress recognized "the limits of the bankruptcy power to deprive creditors of property rights" (at p. 473) is without merit as to Section 522(f)(2). Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, a 1935 case which the majority cites as precedent for its decision, is indeed mentioned in the House and Senate Reports accompanying the new bankruptcy statute, but each time in contexts entirely unrelated to limitations on Section 522(f)(2).[3] Even if the citation to Radford implied recognition of Fifth Amendment limits, it does not follow that Congress intended to abridge Section 522(f)(2). On the contrary, by failing to make express exceptions from the language of that Section, Congress must have believed it could withstand the "recognized" possibility of constitutional challenges. In any event, divining legislative intent is often dubious business as the majority acknowledges when it states that "the legislative history is silent as to whether such avoidance is intended to apply to pre-enactment liens * * * " (at p. 472). Therefore, we are left only with the words of the statute, which compel the application of Section 522(f)(2) to cases arising on or after October 1, 1979, without regard to the age of avoided security interests.
 
 
 35
 Another possible argument for ignoring Section 522(f)(2) with respect to pre-enactment security interests such as defendant's, raised as a question during oral argument, is that its language "to avoid the fixing of a lien" was intended to apply only to those liens not yet "fixed" when the bankruptcy petition is filed, i.e., there was to be no avoidance of any pre-existing liens. The argument clearly proves too much, for it is apparent from the purpose of the Section and from its legislative history that Section 522(f)(2) was meant to apply to certain security interests already existing and attached at the time of bankruptcy. S.Rep.No. 95-989, 95th Cong., 2d Sess. 76, reprinted in (1978) 5 U.S.Code Cong. & Ad.News 5862; H.R.Rep.No. 95-595, 95th Cong., 2d Sess. 362, reprinted in (1978) 5 U.S. Code Cong. & Ad. News 6318; Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc.No. 93-197, 93d Cong., 1st Sess., Part I at 169, 173 (1973). If Section 522(f)(2) were not meant to apply to pre-existing interests, the remainder of its effect would be to avoid liens attaching to property of the bankrupt's estate. But
 
 
 36
 Section 522(f) would not serve its intended purpose if it applied only to security interests that attached to property of the estate * * *. Congress was meticulous in its use of property of the debtor or property of the estate. See, e.g., 11 U.S.C. § 362(a)(4) & (5) (1979). * * * (Section) 522(f) uses "an interest of the debtor in property." Furthermore, § 522(f) makes avoidable a lien that "impairs," not would impair, an exemption and that "is," not would be, a security interest.
 
 
 37
 In re Giles, 9 B.R. 135, 137 (Bkrtcy.E.D.Tenn.1981). Hence despite its curious phrasing Section 522(f)(2) must contemplate avoidance of security interests attached prior to filing.[4]
 
 
 38
 The majority opinion suggests one final argument for construing Section 522(f) (2) as inapplicable to pre-enactment security interests, viz., that absent "specific language," we are to presume that a statute does not apply "retroactively" to destroy a "strong interest" (at p. 473). A few remarks should dispel such a presumption.
 
 
 39
 First, the language of Section 522(f)(2) is "specific" in that it applies to the sort of security interest sought to be avoided here. If Congress meant to include pre- and post-enactment security interests, it would write simply "security interest," which imports both. It is at best semantically inefficient for the majority to require Congress to mention specially each class of strong interests injured by its action. At worst, such a requirement of statute-drafting breeds not better statutes but increased litigation as creditors notice that their peculiar interests too are not specially addressed by "specific language" in the allegedly injuring statute.
 
 
 40
 Second, Section 522(f)(2) is not a truly "retroactive" provision in the sense that it applies to transactions finished prior to enactment and allows the parties no notice of the impending law nor opportunity to adjust their conduct. It is hard to find a valid distinction between a creditor who took the avoidable security interest twenty months before a June 1980 bankruptcy (like Thorp Finance Company), and a creditor who took eighteen months (just after enactment) or six months (just after the effective date) before the same bankruptcy. In each case, the security interest is not affected until the debtor files for bankruptcy. Since the debtor cannot file for bankruptcy under the new Act until at least eleven months after the date of enactment, the creditor in each case has had some opportunity to adjust to the new law: to watch the debtor more closely, and in the case of a default to enforce the security interest or threaten to do so. Surely the defendant commercial creditor here was able to anticipate the emergence of a new bankruptcy law, which took some ten years to enact and which finally was enacted only one month after creation of the security interest.[5] As we have held, "(a)ll parties to a contract are, of necessity, aware of the existence of, and subject to, the power of Congress to legislate on the subject of bankruptcies. They were and are chargeable with knowledge that their rights and remedies, in case the debtor becomes insolvent and is adjudicated a bankrupt, are affected by existing bankruptcy laws and all future bankruptcy legislation which might be enacted." In re Prima Co., 88 F.2d 785, 788 (7th Cir. 1937).[6]
 
 
 41
 Finally, any presumption against destroying "strong interests" will cause mischief when applied to a bankruptcy statute, which by nature undoes many creditors' expectations of repayment. Bankruptcy legislation has historically operated to affect creditor interests that have accrued prior to enactment. See, e.g., Wright v. Union Central Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490; In re Pillow, 8 B.R. 404, 407-410 (Bkrtcy.D.Utah 1981); In re Hoops, 3 B.R. 635, 637 (Bkrtcy.D.Colo.1980), affirmed, sub nom. Rodrock v. Security Industrial Bank, 642 F.2d 1193 (10th Cir. 1981), probable jurisdiction noted, --- U.S. ----, 102 S.Ct. ----, 70 L.Ed.2d ---, 50 U.S.L.W. 3486; 3 Collier on Bankruptcy P 522.01 at 522-8 (15th ed. 1981). The creditor interests here deserve no special presumption against injury.
 
 
 42
 There being no valid argument to the contrary, Section 522(f)(2) must apply along with the rest of the Bankruptcy Act to security interests like this created prior to enactment. The only other appellate court to consider this issue agreed with this conclusion. Rodrock, supra, 642 F.2d at 1196-1197.[7]
 
 
 43
 II. This Statutory Provision Is Constitutional.
 
 
 44
 The remaining issue is whether application of Section 522(f)(2) to avoid this pre-enactment security interest in plaintiff's household goods is an uncompensated taking proscribed by the Fifth Amendment.[8]
 
 
 45
 There is no " 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631. Rather, a taking analysis is bound up with the particular facts of each case. Nevertheless,
 
 
 46
 (i)n engaging in these essentially ad hoc, factual inquiries, the (Supreme) Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. See Goldblatt v. Hempstead, (369 U.S. 590,) 594 (82 S.Ct. 987, 990, 8 L.Ed.2d 130). So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., United States v. Causby, 328 U.S. 256 (66 S.Ct. 1062, 90 L.Ed. 1206) (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.
 
 
 47
 Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659. More recently, in Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332, the Supreme Court reiterated the three hallmarks of a taking determination: "the economic impact of the regulation, its interference with reasonable investment backed expectations and the character of the governmental action * * *." Application of those factors to the defendant's security interest in plaintiffs' household goods shows that the lien avoidance permitted by Section 522(f)(2)(A) does not contravene the taking clause.
 
 A. The "Property" Interest
 
 48
 First, the "investment backed expectations" interfered with are less than substantial. The nonpossessory, nonpurchase-money security interests allegedly taken are far from "property" of the same importance as the mortgages on farms taken in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, or the materialmen's liens on ships taken in Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554. Thus these cases do not support the majority's suggestion that Section 522(f)(2) involves a taking. The types of liens in Radford and Armstrong attach to (or are severed from, depending on the metaphysics) property of the debtor that has directly benefited from the loan or work done. A farm, for example, is mortgaged to buy land, seed, fertilizer or tools. A materialman's lien attaches to a ship because the materialman has supplied the ship with material or labor. In either case, if the underlying debt is unpaid the creditor has a direct property interest in the objects that were purchased or created with the loaned capital or effort.
 
 
 49
 In contrast to such purchase-money interests, defendant's expectations reside in the threat of foreclosure rather than in the collateral. The creditor's interest is often abused and consequently is much less deserving of protection. Unlike the advances in Radford and Armstrong, the borrowed money here was not lent to purchase or improve the household goods listed in this security agreement and specifically avoidable under Section 522(f)(2)(A). The Thirteenth Amendment prohibition against slavery and involuntary servitude prevents the creditor from taking a property interest in the direct beneficiary of his loan, the consumer. Therefore, as here, the creditor must settle for a security interest unrelated to the debt, such as in home furnishings needed by the consumer for ordinary living, and the creditor's "reasonable investment backed expectations" are reduced accordingly. As several bankruptcy courts have recognized:
 
 
 50
 (1) there is no direct relationship between the value of the household goods taken as collateral for the consumer loan and the amount of the loan as exists (, for example,) in a mortgage of real estate; (2) the value of the household goods is often nominal whereas realty has a measurable value comparable to the amount of the loan secured; and (3) the lender making small consumer loans, unlike a mortgagee, does not view a security interest in household goods as a potential substitute for the debt. * * * (T)hese courts have concluded that, since the household goods given as security have little or no actual monetary value to the creditor, whatever property interest the creditor has in the collateral does not rise to the level of a mortgagee's property rights in realty.
 
 
 51
 Matter of Ward, 14 B.R. 549, 561 (S.D.Ga.1981) (summarizing In re Pillow, 8 B.R. 404, 418-420 (Bkrtcy.D.Utah 1981); In re Goodrich, 7 B.R. 590 (Bkrtcy.S.D.Ohio 1980); In re Webber, 7 B.R. 580, 584-586 (Bkrtcy.D.Or.1980); In re Curry, 5 B.R. 282 (Bkrtcy.N.D.Ohio 1980); In re Rutherford, 4 B.R. 510 (Bkrtcy.S.D.Ohio 1980)).[9]
 
 
 52
 Because used household goods have so little resale value, the only "reasonable investment backed expectation" rests in the ability to threaten taking possession of them as a means of inducing payment.[10] But this ability to threaten is entitled to little deference in bankruptcy proceedings, however potent it may be in other circumstances. "Historically, lien rights have entitled their holders to the value of collateral and no more in bankruptcy." In re Pillow, supra, 8 B.R. 404, 411. The majority insists that "(a) property right is of value regardless of the worth of the object in which it is held, and is protected from governmental appropriation by the taking clause of the Fifth Amendment" (at p. 473). But we should look through the form of the interest to its substance and characterize it accordingly.
 
 
 53
 B. Government Interference With the Creditor's Property Interest
 
 
 54
 Even if the label "property interest" is not illusory, however, the difference that being able to avoid such liens under Section 522(f)(2) makes it minimal. Before the enactment of the Bankruptcy Reform Act, initiation of a Chapter 7 proceeding would have presented secured lenders like Thorp with the following options:
 
 
 55
 (a) filing their claims as secured to the extent of the value of the collateral and as unsecured for the amount of the deficiency, subject to proof and allowance by the bankruptcy court;
 
 
 56
 (b) waiving the security and filing the entire claim as unsecured; or
 
 
 57
 (c) remaining aloof from the proceedings and attempting later to obtain satisfaction.
 
 
 58
 See generally F. Kennedy, Priorities and Liens, in Institute of Continuing Legal Education Bankruptcy and The Chapter Proceedings, 163, 177-182 (1976).
 
 
 59
 The economic impact of Section 522(f)(2) is to allow the debtor to force a carefully delimited class of lenders to choose option (b). The creditor, in general, would prefer option (c), because it would allow him to coerce repayment of an amount greater than the "garage-sale" value of the collateral. This Court need not decide whether this ability to coerce is part of the creditor's "property interest" or merely an incident of his pre-bankruptcy contract right to repayment (which the Federal government as opposed to the states may impair) since the interference is so slight. Whatever "investment backed expectations" the creditor had, they are surely at a minimum following the debtor's bankruptcy.
 
 
 60
 Moreover, Congress has not entirely destroyed the expectation of repayment but instead has substituted for it the rights of an unsecured creditor, viz., the substance of option (b). There is some authority, although the decisions are split, that a similar substitution took place under the old Act.[11] Lenders whose collateral was exempt property under the various state-law provisions were sometimes deemed to be wholly unsecured because the collateral was not "of a nature to be assignable under this Act." Repealed 11 U.S.C. § 1(28) (definition of "secured creditor").[12] Against this background, the extent of the surprise to lenders like Thorp can be assessed. First the ambiguities of state exempt-property law have been removed. Small-ticket items of necessity to day-to-day life are exempt, by virtue of Section 522(f)(2)'s lien avoidance provision, whether the debtor chooses state exemptions or uniform federal exemptions under Section 522(b). Second, the possibility that existed under the old Act-that lenders with a security interest in exempt property would be required to treat their entire debt as unsecured-has been made a certainty, but only insofar as the security interest is in household items worth less than $200 apiece. As the Government intervenor notes, the creditor may still proceed against the debtor's collateral to the extent that any item exceeds $200 in value (Br. 36). 11 U.S.C. § 522(d)(3). Taken together, these elements indicate that Section 522(f) is a de minimis interference that does not rise to the level of a taking under the Fifth Amendment.[13]
 
 C. The Character of the Government Action
 
 61
 Finally, as to the character of the government action, Section 522(f) is an adjustment of benefits and burdens among the debtor and his creditors, and among a narrow class of secured creditors and the debtor's general creditors. It seems unlikely that defendant, the holder of a nonpossessory, nonpurchase-money security interest in household goods, has a significantly greater expectation of repayment than other unsecured creditors of the consumer, such as unsecured retailers, landlords, and credit-card companies. It is even more unlikely that the difference in expectations should be allowed a veto over Congress' power to make bankruptcy law. A fair reordering such as this of the competing claims of creditors to available funds of a bankrupt should be immune to a taking challenge. See Sax, Takings, Private Property and Public Rights, 81 Yale L.J. 149, 161 (1971).
 
 
 62
 The government action here is not of the nature of a physical invasion since Section 522(f)(2) does not apply to lenders who have possession of the collateral pursuant to possessory security interests. Nor does the action inure to the government's own benefit. Thus this case is again distinguishable from Armstrong, supra, where the government "took" materialmen's liens that encumbered government-owned ships.
 
 
 63
 As ably discussed in the majority opinion, Congress intended to discourage the abusive practices of creditors like Thorp by allowing debtors in bankruptcy to avoid the security interests instrumental to the abuse. In deciding whether such an action is a taking, we must remember that an affirmative answer would either force significant abandonment of the Congressional purpose or entail Congressional compensation for disappointed lenders.
 
 
 64
 Suffice it to say that government regulation-by definition-involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by purchase. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (43 S.Ct. 158, 159, 67 L.Ed. 322) (1922).
 
 
 65
 Andrus v. Allard, 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210. Congress must have the freedom to adjust benefits and burdens when it acts pursuant to its bankruptcy powers, because-again, by definition-there are always too few funds of the bankrupt to make all of the creditors whole. Unless Congress is to be made the guarantor of defaulting debtors, its bankruptcy statute must be allowed to devalue the rights of at least creditors like this one. There is no irrationality in Congress' choice to "smart" this particular class of creditors, and therefore there is no need for compensation when avoiding liens on these necessities of family life.
 
 
 66
 I would affirm the order of the bankruptcy court avoiding defendant's security interest.
 
 
 
 *
 Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation
 
 
 [1]
 Retroactive application is used in this opinion in the traditional sense that the statute purports to determine the legal significance of events prior to the date of its enactment. See Greenblatt, Judicial Limitations on Retroactive Civil Legislation, 51 Nw.U.L.Rev. 540, 544-45 (1956)
 The debtors contend that Thorp is barred from raising the issue of statutory construction in this court but rather is limited to its constitutional challenge to § 522(f)(2), for two reasons. First, they assert that Thorp failed to raise the issue of statutory construction below; second, they rely on a stipulation between Thorp and the Giffords below, which stated that, "the sole question for the Court's determination is the validity of defendant's claim that 11 U.S.C. Sec. 5.22 F (sic) as applied to the defendant is unconstitutional."
 It is true as a general rule that a party is precluded from raising an issue for the first time in this court, see, e.g., Stern v. United States Gypsum, Inc., 547 F.2d 1329, 1333 (7th Cir. 1977), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467. This is not such a case. Whether § 522(f)(2) is unconstitutional "as applied," explicitly raises the issue of retroactive application, and the question is thus within the intendment of the stipulation. Although the issue of statutory construction could indeed have been more fully developed below, it was expressly considered and ruled upon by the Bankruptcy Court panel.
 Furthermore, in light of the strong policy mandate, reemphasized by the Supreme Court in NLRB v. Catholic Bishop, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), see further discussion, infra, that we construe statutes in a manner that, if possible, avoids constitutional questions, this case would at any rate fall within the exception to the Stern rule. See Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932); Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). That exception provides that issues not raised below may be reached "where, in exceptional cases, justice demands more flexibility." 547 F.2d at 1333. We will, therefore, consider Thorp's statutory construction arguments, as well as its constitutional challenge to the section.
 
 
 [2]
 "(N)or shall private property be taken for public use, without just compensation." U.S.Const. Amend. V
 
 
 [3]
 Chief Judge Cummings' dissenting opinion suggests that no valid distinction may be drawn between a creditor on the one hand who took a lien immediately prior to enactment of the new Code, and on the other hand, one who took immediately thereafter, and one who took immediately subsequent to the effective date, since all had the opportunity subsequent to enactment to adjust to the new law. We agree that because post-enactment, pre-effective creditors had notice at the time credit was extended and their lien attached that the new Code would govern subsequent bankruptcies, even though the new Code was not technically effective, they should be treated the same as post-effective creditors. See Rodrock, 642 F.2d at 1196 n.3, Dotson v. Bradford, 6 B.R. 741 (D.Ct.D.Nev.1980). However, because a pre-enactment lienor has a property interest which is valid under the Code at the time of its attachment, and did not have notice of the impending effectiveness of the new Code, treating him similarly raises the spectre of an unconstitutional taking, as detailed in the majority opinion
 The dissent further contends, relying on In re Prima, 88 F.2d 785 (7th Cir. 1937), that Congress' power to change the bankruptcy laws was an implied term of the contract, and that Thorp's property right was therefore somehow contingent, and subject to destruction in the event of change of the Code. The Prima case has no application here, for it involved the contractual question of ordering of priorities, not the destruction of a vested property right. Furthermore, as the Prima court repeatedly stressed, the property rights of the lienors were not impaired by issuance of the trustee certificates, because there was ample security even after issuance of the certificates to satisfy all secured claims. 88 F.2d at 787. That result is in significant contrast to the instant case where it is undisputed that application of § 522(f)(2) to Thorp's property interest would result in its destruction.
 The dissent also suggests that the effect of § 522(f)(2) could be postponed for more than four years beyond the effective date by the additional extension of credit on the same financing agreement with the same security. As noted above, we believe any extension of credit subsequent to the enactment date of the new Code would be subject to its provisions, regardless of the form of the transaction, and that no such gap would be created by limiting the effect of § 522(f)(2) to post-enactment transactions.
 
 
 [1]
 There are perhaps three reasons of arguable merit for twisting a statute to evade constitutional issues, but each is inapplicable here. First, the construction might be deemed necessary to counter the unjust effects of some rule of constitutional jurisprudence that for independent reasons must be maintained. For example, Greenblatt, Judicial Limitations on Retroactive Civil Legislation, 51 Nw.U.L.Rev. 540 (1956), cited by the majority, would allow the Court to adopt a statutory reconstruction that is "not totally implausible" when a bad statute otherwise would be upheld under the due process clause "because of the ordinary presumption in favor of constitutionality." Id. at 553 (citations omitted). There is no similar danger in this case; Congress is held fully accountable for any unconstitutional takings. Second, because of the tendency of new decisions to damage the precedential foundation, some issues of constitutional law are best adjudicated infrequently. The First Amendment Religion Clauses provide a good example, as the majority notes by citing National Labor Relations Board v. Catholic Bishop, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533. Taking cases, on the other hand, are usually confined to their particular facts. See p. 478, infra. Finally, there may be instances when interbranch diplomacy suggests that a statute be construed to avoid an explicit finding of unconstitutionality. See, e.g., Hart & Wechsler's The Federal Courts and the Federal System 336 (2d ed. 1973) ("the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity, or of withdrawing jurisdiction, in order to defeat (constitutional rights)"). Diplomacy here can only suggest that Congress be given some reason for this Court's refusal to apply its law, so that it may know how to improve the law to the Court's liking
 When a statute is ambiguous from its face, purpose, and history, a court may be justified in choosing one rather than another of its possible constructions. But when the statute evinces no ambiguity, a federal court is without power independent of the Constitution for rewriting it. "A statute is not 'a nose of wax to be changed from that which the plain language imports....' Yu Cong Eng v. Trinidad, 271 U.S. (500), at 518 (46 S.Ct. 619, 623, 70 L.Ed. 1059)." Catholic Bishop, supra, 440 U.S. at 518, 99 S.Ct. at 1328 (Brennan, J., dissenting).
 
 
 [2]
 Section 522(f)(2) provides (11 U.S.C. § 522(f)(2)):
 Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is-
 (2) a nonpossessory, nonpurchase-money security interest in any-
 (A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
 (B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
 (C) professionally prescribed health aids for the debtor or a dependent of the debtor.
 
 
 [3]
 Radford is cited in connection with Section 522(c) (which provides that with certain exceptions property exempted under Section 522 is not liable for any prior debt of the debtor) by Senate Report No. 95-989, 95th Cong., 2d Sess. 76 and House Report No. 95-595, 95th Cong., 2d Sess. 361, reprinted in (1978) 5 U.S.Code Cong. & Ad.News 5862, 6316 for the proposition (stated identically in both reports) that "(t)he rule of Long v. Bullard, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), is accepted with respect to the enforcement of valid liens on nonexempt property as well as on exempt property." Long v. Bullard held that when "the creditor neither proved his debt in bankruptcy nor released his lien * * * his security was preserved notwithstanding the bankruptcy of his debtor." 117 U.S. at 620-621, 6 S.Ct. at 918. Both reports refer only to 295 U.S. page 583, 55 S.Ct. page 860 of the Radford opinion, where Long v. Bullard is cited as historical support for the same proposition: "But unless the mortgagee released his security, in order to prove in bankruptcy for the full amount of the debt, a mortgage even of exempt property was not disturbed by bankruptcy proceedings." 295 U.S. at 582-583, 55 S.Ct. at 860. Clearly, Congress cited these cases to explain its adoption of a technical bankruptcy rule in Section 522(c) as to exemptions but not to limit the effect of Section 522(f)(2)
 Radford is also cited in connection with Section 361 (which deals with adequate protection of an interest of an entity in property) by Senate Report No. 95-989, 95th Cong., 2d Sess. 49 and House Report No. 95-595, 95th Cong., 2d Sess. 339, reprinted in (1978) 5 U.S.Code Cong. & Ad.News 5835, 6295 as one of the sources of the notion of "adequate protection" for secured creditors such as the mortgagee in Radford. Section 361 is not at issue on this appeal nor applicable to the present exemption. In any case, under Section 361 and according to the House Report, such adequate protection would not exceed the value of the collateral, which in this case is worth much less to the creditor than the threat of foreclosure on the security interest (see pp. 479-480 infra).
 
 
 [4]
 Probably Congress used the phrase "avoid the fixing of a lien" to relate avoidance of the security interest back to the time it attached. By definition, the "fixing" or granting of a security interest is a "transfer." 11 U.S.C. § 101(40) (1979); 11 U.S.C. § 1(30) (prior Act, 1976) (" 'Transfer' shall include * * * fixing of a lien upon property * * *."); In re Pine, 11 B.R. 595, 601-604 (Bkrtcy.E.D.Tenn.1981); In re Giles, supra, at 137. The debtor's avoidance of the "fixing of a lien" is thus analogous to the trustee's avoidance of a late perfected security interest under the preferential transfer section, 11 U.S.C. § 547. "Under that section, technically the trustee avoids the grant of the security interest, the transfer made within the preference period. * * * The terminology used in § 522(f) is surprising as a practical matter but consistent in concept with other provisions of the Code." In re Giles, supra, at 137 (citation omitted)
 
 
 [5]
 Quite likely there are creditors who were informed of the coming changes and perfected as many of these security interests as possible prior to enactment. In Wisconsin, where this loan transaction took place, the financing statement that perfects the security interest is good for at least five years, Wis.Stat.Ann. § 409.403(2) & (3), and the same security interest may be used to secure a series of different loans to the consumer. Wis.Stat.Ann. § 409.204(3). Thus under the majority holding, with a single security interest perfected just prior to enactment and a few pieces of furniture, the creditor can lend to a single customer and ignore Section 522(f)(2) for a period of four or more years after the effective date of the Bankruptcy Act. Congress did not intend to postpone Section 522(f)(2) indefinitely, but such a "gap" in time between Congressional action and an effective remedy would seem to be the effect of the majority decision
 Since the record on appeal excludes the "fine print" terms on the reverse side of the security agreement used here, it is uncertain whether the security interest extended to post-enactment advances. In cautious dictum, however, the majority suggests to Thorp that avoidance of the security interest with respect to post-enactment advances would not be deemed a taking. Although such a compromise has a ring of fairness, the distinction it draws between pre- and post-enactment advances may be spurious. The "property" interest in either case would have been created prior to enactment of Section 522(f)(2), and until this decision, creditors had the same expectations under Wisconsin law of using the security interest to coerce repayment of their post- and pre-enactment advances.
 
 
 [6]
 See also Wright v. Union Central Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490, quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413: "The mortgage contract was made subject to the constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between plaintiffs and defendant. 'Not only are existing laws read into contracts in order to fix obligations as between parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.' " Accord, Matter of Ward, 14 B.R. 549, 562 (S.D.Ga.1981); In re Bradford, 6 B.R. 741, 744 (D.Nev.1980); Matter of Teske, 9 B.R. 18, 20 (Bkrtcy.W.D.Mich.1981); In re Schulte, 8 B.R. 12, 16 (Bkrtcy.D.Kan.1980); In re Webber, 7 B.R. 580, 584 (Bkrtcy.C.Or.1980); In re Seltzer, 7 B.R. 80, 82 (Bkrtcy.D.Colo.1980); In re Head, 4 B.R. 521, 524 (Bkrtcy.D.Tenn.1980); In re Steinart, 4 B.R. 354, 358 (Bkptcy.W.D.La.1980). Cf. Wis.Stat.Ann. § 409.104(1) ("This chapter (regarding secured transactions) does not apply: (1) To a security interest subject to any statute of the United States * * *.")
 
 
 [7]
 As explained in Rodrock :
 If the Reform Act were applied only to those cases commenced after October 1, 1979, which involved security interests which came into existence after that date, there would be no bankruptcy law applicable to cases filed after October 1, 1979. We cannot believe that Congress intended such a no-man's land.
 
 
 [8]
 "(N)or shall private property be taken for public use, without just compensation." U.S.Const.Amend. V
 
 
 [9]
 Wisconsin law establishing and regulating security interests also recognizes these distinctions between purchase- and nonpurchase-money types of liens. The Wisconsin Consumer Act, for example, which provides special protection for "consumer credit transactions," Wis.Stat.Ann. §§ 421.301(10), 422.102, does not apply to first mortgages on real estate, Wis.Stat.Ann. § 421.202(7); see also Miller, The Effect of WCA on Farm Credit, 46 Wis. Bar Bull. 20 (April 1973), or to "liens which arise by operation of law or by force of a mechanics' lien or similar statute * * *." Holbrook & Bugge, Creditor's Responsibilities and Duties Under the WCA, 46 Wis. Bar Bull. 37, 43 (Feb. 1973). Thus, while the Wisconsin Consumer Act applies to the security interest here, it would be inapplicable to the sort of property interests taken in Radford and Armstrong. Similarly, purchase-money security interests are accorded various priorities over "lien creditors" and nonpurchase-money security interests, Wis.Stat.Ann. §§ 409.301(2), 409.312(3) & (4), and may be created more easily in some instances. Wis.Stat.Ann. § 409.302(1)(d). These differences are not dispositive, but further evidence that nonpurchase-money security interests in consumer effects are not property interests whose taking must be compensated. Cf. Dames & Moore v. Regan, --- U.S. ----, 101 S.Ct. 2972, 2984 n.6, 69 L.Ed.2d 918 (President Carter's nullification of attachment of Iranian assets was not a taking because there was no "property" interest in the attachment)
 
 
 [10]
 See Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc.No. 93-197, 93d Cong., 1st Sess., Part I at 169 (1973) ("The Commission is also of the opinion that nonpurchase-money security interests should not be enforceable as to items of property essential to a debtor's well-being, such as wearing apparel, which are of little or no value to a creditor, other than as a means of coercing repayment."); H.R.Rep.No. 95-595, 95th Cong., 2d Sess. 127, reprinted in (1978) 5 U.S.Code Cong. & Ad.News 6088 ("In fact, were the creditor to carry through on his threat and foreclose on the property, he would receive little, for household goods have little resale value. They are far more valuable to the creditor in the debtor's hands, for they provide a credible basis for the threat, because the replacement costs of the goods are generally high. Thus, creditors rarely repossess, and debtors, ignorant of the creditors' true intentions, are coerced into payments they simply cannot afford to make.")
 
 
 [11]
 The problem and the split of authority are discussed in In re Cain, 291 F.Supp. 1, 2 (N.D.Texas 1968)
 
 
 [12]
 The alternate branch, represented by Cain itself, treated the creditor as secured, valued the extent of the security interest, enforced any unsecured balance in the bankruptcy court, and continued the security interest in effect beyond the termination of the bankruptcy. This approach corresponds to option (c). For lenders other than those affected by Section 522(f)(2) it continues to be available under Section 522(c) of the new Act. See note 3 supra
 
 
 [13]
 The substituted rights of an unsecured creditor need not be equal in value to the property allegedly taken. "While these rights may well not have constituted 'just compensation' if a 'taking' had occurred, the rights nevertheless undoubtedly mitigate whatever financial burdens the law has imposed on (creditors) and, for that reason, are to be taken into account in considering the impact of the regulation." Penn Central, supra, 438 U.S. at 137, 98 S.Ct. at 2666